**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| AQUA CONNECT, INC. a Nevada corporation, and STRATEGIC TECHNOLOGY PARTNERS, LLC, a Nevada limited liability company,<br><br>Plaintiffs,<br><br>v.<br><br>GOTO TECHNOLOGIES USA, LLC, a Delaware limited liability company,<br><br>Defendant. | C.A. No.<br><br>JURY TRIAL DEMANDED |

## COMPLAINT FOR PATENT INFRINGEMENT

This is an action for patent infringement arising under the Patent Laws of the United States, 35 U.S.C. § 1 *et seq*. In this action, Plaintiffs Aqua Connect, Inc. ("Aqua Connect" or "AC") and Strategic Technology Partners, LLC ("STP") (together, "Plaintiffs") allege direct and indirect patent infringement against Defendant GoTo Technologies USA, LLC ("GoTo" or "Defendant").

In this action, Plaintiffs assert the method claims, and only the method claims, of the Patents-in-Suit (as defined below). In this action, Plaintiffs do not assert, and will not assert, any claim of the Patents-in-Suit other than the method claims.

## BACKGROUND

1. Plaintiffs own U.S. Patent No. RE46,386, entitled "Updating a user session in a Mach-derived computer system environment" ("the '386 patent," attached as **Exhibit 1**), and U.S. Patent No. 8,924,502, entitled "System, method and computer program product for updating a user session in a Mach-derived system environment" ("the '502 patent," attached as **Exhibit 2**), (collectively, the "Patents-in-Suit"). Plaintiffs have the exclusive right to assert all causes of action

arising under the Patents-in-Suit, and all right to remedies for infringement thereof.

2. The inventor of the Patents-in-Suit is Joseph Cohen ("Cohen"). At age 14, Mr. Cohen became the youngest person to achieve a Certified NetWare Engineer (CNE) degree in the history of computing, the previous person being 20 years old. He also became the youngest member of the Network Professional Association (NPA), at age 14. At age 15 he received a Microsoft Certified Professional (MCP) certification, and then a Microsoft Certified Systems Engineer (MCSE) certification at the age of 15. He was the youngest person to achieve four industry standard accreditations at the time by two separate standards setting organizations. He received personal letters from President Clinton, and became the Vice-President of the Los Angeles chapter of the Network Professional Association where he helped to oversee the largest growth of members in the organization's history.

3. The claims of the Patents-in-Suit are patent eligible and are directed to a specific improvement in computer technology and not an abstract idea. For example, the claims improve the way computer systems operate, improving the ability of Mach-derived systems to be viewed and controlled by users remotely over a network. In addition, the claims solve technological problems with prior art remote desktop solutions, and claim improvements consisting of specific technological solutions. One aspect of these solutions is using a specific new system architecture for transmitting data between different processes running on separate parts of a Mach-derived system: an "agent client" in one Mach context and an associated "agent server" in a separate Mach context, which communicate with each other over a system communication facility.

4. This architecture—agent client in one context and agent server in a separate context—improved communication in and out of user contexts on Mach-based computer systems. More specifically, it allowed improved access and control of the user interface of the Mach-derived

system from a remote computer over a network.

5. In 2007, inventor Joseph Cohen realized that instead of following the conventional wisdom to have a single remote desktop task in a single context, he could split up the functions carried out by a remote desktop application into two separate but associated tasks in two separate Mach contexts: for example, one in a user context (which he called the "agent server"), and another in the system context (which he called the "agent client").

6. Mr. Cohen's invention went against conventional wisdom, which taught that functions should not be split up across multiple tasks (which are expensive resources) or contexts, especially when they need to pass large amounts of data among them.

7. Mr. Cohen's invention had several benefits. For example, it allowed a user session that was being controlled by a user on a remote computer to run in the background on the host computer, as opposed to being displayed on the local screen of the host computer. It enabled multi-user terminal server functionality. Because the agent client remained in, *e.g.,* the system context and could communicate with an agent server in a user context, any number of users could connect to the agent client and log in, at which point a new agent server for just that user would be created and would interact with the agent client. Using the agent server as an intermediary allowed the terminal server application to efficiently manage the network connection, for example, by prioritizing connections that are time sensitive. Because this solution allowed for true isolation of user tasks within a user context and did not require access to user tasks from, *e.g.*, the system context, the data of each terminal server user was more secure than regular multi-user functionality.

8. The inventions claimed in the Patents-in-Suit solved problems associated with conventional prior art remote desktop applications. For example, conventional remote desktop applications exposed the user context directly to the network and therefore to the possibility of

malicious code accessing the user context. Conventional applications also did not allow a second user to connect and start up his or her own session with its own context, which solved a long felt need in the Mach-based terminal server solution market. Such conventional solutions also did not allow a user to connect to a computer using his or her own credentials if another user was logged in on the host computer, even if that other user was not using the computer at the time. Conventional solutions also failed to allow a remote user session to run in the background on the host computer. For example, in conventional systems, if a user was controlling the user interface remotely, that user interface would also be displayed on the locally connected display of the host computer. As another example, conventional solutions required establishing, tearing down, and then re-establishing a connection with the remote computer, which required additional system resources and led to delays and connectivity issues. These are only examples of how the inventions claimed in the Patents-in-Suit were unconventional.

9. Each method claim also recites unconventional technical steps. For example, the method claims recite a technical solution to a technical problem: a software architecture for transferring data in and out of separate Mach contexts and over a network to a remote computer to update the user interface and control the host computer, including: (1) at least one agent client in one Mach context; and (2) at least one agent server in a separate Mach context, which are associated with the agent client(s) in a way that allows data to be transferred between the two. This combination of components and steps as well as each individual component or step itself was unconventional because the conventional solutions used a single task in the user context, not two associated tasks in different contexts. Each method claim recites additional unconventional technical steps, each of which is independently sufficient to confer patent-eligibility.

10. In addition, during prosecution of the ‘386 Patent, the Examiner expressly found

that the claims were patent-eligible under the standard set forth in *Alice*.

11. On June 3, 2015, the Examiner issued an Office Action in the prosecution of the application that reissued as the '386 Patent. *See* **Exhibit 3** (6/30/2015 Office Action). In it, the Examiner provisionally found that the claims of the '386 Patent were invalid under 35 U.S.C. § 101 and *Alice*, because they were "directed to the abstract idea of using a computer to perform a series of mental steps that people … can and regularly do perform in their head," and because the claims "do[] not include additional elements that are sufficient to amount to significantly more than the [abstract idea] because the additional limitations are directed to … functionalities that are well-understood, routine and conventionally known to the industry." Ex. 3 at 3-4.

12. The applicant responded to the 6/30/2015 Office Action on October 15, 2015. *See* **Exhibit 4** (10/15/2015 Response to Office Action). In its response, the applicant argued that the claims were patent-eligible under § 101 and *Alice*, because, *inter alia*: (i) "Applicant's claimed invention … sets forth a computer solution to a computer based problem relating to computer terminal access to remote computer systems;" (ii) "Applicant is not aware of any humans capable of accessing remote computer systems in their head;" (iii) the "technological functions [of the claimed invention] are necessarily rooted in computer technology to overcome a problem specifically arising in the realm of computer networks and computer systems, in this case a particular Mach-derived computer system;" and (iv) "prior to Applicant's invention, it was not possible to provide network access to a remote system by a Mach-derived system, and thus it cannot be said to be conventionally known." Ex. 4 at 18-24.

13. On June 13, 2016, the Examiner issued another Office Action in the prosecution of the application that reissued as the '386 Patent. *See* **Exhibit 5** (6/13/2016 Office Action). In it, the Examiner stated that "Applicant's arguments, filed 10/15/15, with respect to the [§] 101 rejection

have been fully considered <u>and are persuasive. The [§] 101 rejections of [claims] 1-35 ha[ve] been withdrawn</u>." Ex. 5 at 23. Thus, the USPTO fully considered the issue, and concluded that the claims of the '386 Patent (including the method claims) are patent-eligible.

14. This Court reached the same conclusion in *Aqua Connect et al. v. TeamViewer US, LLC*, D. Del. No. 18-cv-01572 ("*TeamViewer")*. In *TeamViewer*, the Defendant (TeamViewer) filed a motion for judgment on the pleadings under Rule 12(c), arguing that the claims of the '386 and '502 patents were patent-ineligible under § 101 and *Alice*. *See* **Exhibit 6 (**9/16/2020 ruling on motion). The motion was fully briefed, and oral argument was held on August 20, 2020. Ex. 6 at 1. After oral argument, the Court <u>denied</u> the motion, and found that TeamViewer failed to show that any claim of the Patents-in-Suit was patent-ineligible. *Id.* at 5-10. The Court "agree[d] with Plaintiffs" that the Patents-in-Suit "are not directed to an abstract idea but instead to an improvement in computer technology that solved the problem of how to securely and synchronously update user data in Mach-derived systems in a timely manner." *Id.* at 9. It thus found that the method claims of the Patents-in-Suit were patent-eligible at *Alice* Step 1. *Id.* at 10.

15. Accordingly, both the USPTO and this Court have considered whether the method claims of the Patents-in-Suit are directed to patent-eligible subject matter, and both have concluded that they <u>are</u>. That further confirms their eligibility, which is presumed. 35 U.S.C. § 282.

## <u>THE PARTIES</u>

16. Plaintiffs repeat and reallege each of the allegations set forth in Paragraphs 1-15 *supra* as if fully set forth herein.

17. Aqua Connect, Inc. ("Aqua Connect" or "AC") is a Nevada corporation with a principal place of business at 5528 S. Fort Apache Road, Las Vegas, NV 89148.

18. Strategic Technology Partners, LLC ("STP") is a Nevada limited liability company.

STP is a wholly-owned subsidiary of Aqua Connect. STP has a principal place of business at 5528 S. Fort Apache Road, Las Vegas, NV 89148.

19. On information and belief, GoTo Technologies USA, LLC ("GoTo") is a Delaware limited liability company with its principal place of business at 333 Summer Street, 5th Floor, Boston, Massachusetts 02210.

20. STP is the owner, by way of assignment, of all right, title and interest in and to the '386 Patent, including all rights to sue for past damages. On April 29, 2009, the inventor of the '386 Patent, Joesph Cohen assigned all rights, title and interest to all patents granted upon his provisional application REMOTE USER INTERFACE IN A TERMINAL SERVER ENVIRONMENT, filed September 23, 2008 and assigned Ser. No. 61/099,485, to Aqua Connect. A copy of that assignment is attached as **Exhibit 7**. That assignment was duly recorded with the USPTO on February 25, 2014. *See* Ex. 7 at 2. On February 18, 2014, Aqua Connect assigned to STP all of its right, title and interest in and to, *inter alia*: (i) the provisional application titled REMOTE USER INTERFACE IN A TERMINAL SERVER ENVIRONMENT, with Ser. No. 61/099,485; (ii) U.S. Pat. No. 8,549,093, titled UPDATING A USER SESSION IN A MACH-DERIVED SYSTEM ENVIRONMENT; (iii) "all patents and patent applications … to which any of [the foregoing] directly or indirectly claims priority, and/or … for which any of the [foregoing] directly or indirectly forms a basis for priority;" and (iv) "all reissues … of the foregoing." *See* **Exhibit 8** (2/18/2014 assignment) at 3-4. That assignment was duly recorded at the USPTO on February 27, 2014. *Id.* at 1. U.S. Pat. No. 8,549,093, which was expressly included in the 2/18/2014 assignment from AC to STP, reissued as the '386 Patent on May 2, 2017. Thus, under the 2/18/2014 assignment, STP is the assignee of all right, title and interest in and to the '386 Patent.

21. STP is the owner, by way of assignment, of all right, title and interest in and to the

‘502 Patent, including all rights to sue for past damages. On April 29, 2009, the inventor of the ‘502 Patent, Joesph Cohen, assigned all rights, title and interest to all patents granted upon his provisional application REMOTE USER INTERFACE IN A TERMINAL SERVER ENVIRONMENT, filed September 23, 2008 and assigned Ser. No. 61/099,485, to Aqua Connect. A copy of that assignment is attached as Exhibit 7. That assignment was duly recorded with the USPTO on February 25, 2014. *See* Ex. 7 at 2. On February 18, 2014, Aqua Connect assigned to STP all of its right, title and interest in and to, *inter alia*: (i) the provisional application titled REMOTE USER INTERFACE IN A TERMINAL SERVER ENVIRONMENT, with Ser. No. 61/099,485; (ii) U.S. Pat. App. No. 14/035,917, titled REMOTE USER INTERFACE IN A TERMINAL SERVER ENVIRONMENT; and (iii) “all patents and patent applications … to which any of [the foregoing] directly or indirectly claims priority, and/or … for which any of the [foregoing] directly or indirectly forms a basis for priority.” *See* Exhibit 8 (2/18/2014 assignment) at 3-4. That assignment was duly recorded at the USPTO on February 27, 2014. *Id.* at 1. U.S. Pat. App. No. 14/035,917, which was expressly included in the 2/18/2014 assignment from AC to STP, issued as the ‘502 Patent on December 30, 2014. Thus, under the 2/18/2014 assignment, STP is the assignee of all right, title and interest in and to the ‘502 Patent.

22. Aqua Connect is STP’s exclusive licensee of the Patents-in-Suit, including the exclusive licensee of all rights to sue for patent infringement. Shortly after Aqua Connect assigned its rights in the Patents-in-Suit to STP on February 18, 2014, Aqua Connect and STP entered into an exclusive license agreement whereby STP granted to AC a worldwide exclusive license to the Patents-in-Suit, including the exclusive rights to practice the Patents-in-Suit, to exclude others from practicing the Patents-in-Suit, to sub-license others to make, use, and sell products and methods practicing the Patents-in-Suit, and to sue for patent infringement and collect damages for

that infringement (including treble damages and attorneys' fees), including the right to sue for past acts of infringement and collect past damages. On September 5, 2017, AC and STP executed a Confirmatory Exclusive License, confirming the terms of the exclusive license that had been agreed to shortly after February 18, 2014. A copy of that Confirmatory Exclusive License is attached as **Exhibit 9** hereto.

## JURISDICTION AND VENUE

23. Plaintiffs repeat and reallege each of the allegations set forth in Paragraphs 1-22 *supra* as if fully set forth herein.

24. This action arises under the patent laws of the United States, Title 35 of the United States Code. Accordingly, this Court has original subject matter jurisdiction over this action under 28 U.S.C. §§ 1331 and 1338(a).

25. This Court has general personal jurisdiction over GoTo because GoTo is domiciled in this district, because GoTo is organized under the laws of the State of Delaware.

26. This Court has specific personal jurisdiction over GoTo because, on information and belief, GoTo has committed acts of direct or indirect infringement of the Patents-in-Suit within this district, including by inducing customers in this district to use the accused instrumentalities in a manner that directly infringes the Patents-in-Suit.

27. Venue is proper in this district under 28 U.S.C. § 1400(b) because GoTo resides in this district, because it is organized under the laws of the State of Delaware.

## THE PATENTS-IN-SUIT

28. Plaintiffs repeat and reallege each of the allegations set forth in Paragraphs 1-27 *supra* as if fully set forth herein.

29. The first application for the Patents-in-Suit was Provisional Application No.

61/099,485, filed on September 23, 2008. *See* **Exhibit 10** (provisional application).

30. The applicant then filed Application No. 12/586,613 (the "'613 Application") on September 23, 2009, claiming priority to the provisional application. The '613 Application issued as U.S. Pat. No. 8,549,093 on October 1, 2013. On February 27, 2014, the applicant filed reissue Application No. 14/191,450, seeking reissue to make certain amendments to the claims. The reissue application was granted on May 2, 2017, issuing as Reissue Patent No. RE,46,386.

31. On September 24, 2013, the applicant filed Application No. 114,035,917 (the "917 Application") as a continuation of the '613 Application. The '917 Application issued as U.S. Pat. No. 8,924,502 on December 30, 2014.

32. Because the '502 patent issued from a continuation of the application that resulted in the '386 Patent, the specifications of both patents are the same. Thus, Plaintiffs will summarize the disclosures of the Patents-in-Suit by reference to the specification of the '386 Patent, with the understanding that there are corresponding disclosures in the specification of the '502 Patent.

33. The Patents-in-Suit solved major problems in the remote control of computers running operating systems derived from an operating system called "Mach."

34. Mach was a "micro-kernel" operating system developed at Carnegie Mellon University (CMU) in the 1980s and 90s. The main difference between Mach and traditional operating systems was that Mach was designed to have as few resources as possible running in the operating system "kernel." The "kernel" of an operating system is its "core"—the lowest-level part of the operating system, which has complete control over everything within it. In operating system design, the advantage of including a resource within a kernel is that it allows the operating system fast, complete, unfettered access to the resource, generally improving speed. However, a disadvantage of including a resource within a kernel is that—because the kernel has complete

control over everything within it—if the resource is vulnerable to exploitation, that exploitation could give an attacker access to the entire kernel, compromising the entire system. Another disadvantage of including a resource within a kernel is that it can reduce system stability, allowing a fault in one resource to crash the entire kernel, rather than just the resource itself.

35. The allocation of resources in a traditional "monolithic" operating system, such as Windows, is depicted below:




36. As seen above, in a monolithic operating system, a number of resources are included within the operating system kernel, including: (i) the device drivers, which are responsible for handling input/output data (keyboard strokes, mouse movements, display updates, etc.); and (ii) the file system and virtual file system (VFS), which controls access to data stored on the computer's storage devices (e.g., hard drives). Because the device drivers and filesystem are

within the kernel, they have direct and fast access to the system hardware. However, that carries the above-mentioned disadvantages in terms of security and stability.

37. The allocation of resources in a Mach-based system is depicted below:




38. As seen above, in Mach-based systems, very few resources—namely, inter-process communication (IPC) and virtual memory—reside in the kernel. The other resources that would be within the kernel in a monolithic operating system, such as the device drivers and the filesystem, are instead moved into user sessions. This carries the advantage that exploitation of, or instability in, the device drivers or file system will not directly compromise the kernel. However, it carries the disadvantage that the device drivers and file system can no longer directly access the computer hardware. Rather, they have to first communicate with the kernel using IPC.

39. IPC refers to various methods by which two separate processes running on the same computer may communicate. Two types of IPC are shown below:




40. The diagram on the left depicts a "shared memory" method of IPC. In this method, two processes—Process A and Process B—each have access to the same shared memory address. Process A can communicate data to Process B by writing the data to the shared memory address, which Process B then reads, or *vice versa*. The diagram on the right depicts a "message passing" method of IPC. In this method, Process A sends a data message to the kernel, which then forwards the message to Process B. Various types of message passing are possible, including pipes (one-way communication channels), sockets (two-way communication channels), and ports (a one-way kernel-managed message queue).

41. Starting with MacOS X, released in 1999, all of Apple's major operating systems—including MacOS, iOS, iPhoneOS, and iPadOS—have been based on the "Darwin" kernel, which has the Mach microkernel at its core. *See Operating System Concepts, 10th Ed.*, Silberschatz *et al.* (2018) at 85-89, Appx A, 18. Accordingly, all modern Apple devices—including Macintosh desktops and laptops, iPhones, iPads, etc.—run an operating system with Mach at its core.

42. This dependence on Mach makes it particularly difficult to design software for the remote control of Apple devices. Because Apple devices are based on Mach, the device drivers on Apple devices—including the device drivers responsible for operating the network interface (Ethernet, Wi-Fi), and for receiving keyboard input, for receiving mouse input, and for pushing video data to the display (KVM, or "keyboard, video and mouse")—are controlled by individual user sessions, rather than the OS kernel. As a result, on Apple devices, it was generally not possible to remotely control multiple user sessions at the same time, because only one user session could access the network interface (to communicate with the remote computer) and the KVM drivers (to accept keyboard/mouse input and push display data to the remote computer) at once.

43. Furthermore, prior to the invention, it was generally not possible for a remotely-controlled user session to run in the background of an Apple host device. That is because, prior to the invention, the active user session would be in full control of the host's KVM, and there was no way to suppress the display of that user session on the screen of the host device.

44. Still further, in conventional remote desktop applications for Apple devices, the full user context was exposed directly to the network interface. This rendered the entire user context vulnerable to attack from malicious users on the network.

45. Still further, in conventional remote desktop applications for Apple devices, establishing each new remote session required setting up, tearing down, and then re-establishing a connection with the remote computer, which required additional system resources and led to delays and connectivity issues.

46. The invention of the Patents-in-Suit solved these problems. The inventor, Cohen, recognized that by establishing two separate processes in two separate contexts, and using interprocess communication to communicate between them, it might be possible to overcome the

foregoing limitations of remote desktop applications on Mach-based host devices. From that recognition, Cohen invented a novel architecture for remote desktop applications on Mach-based devices. The overall architecture he invented is depicted in Figure 1, reproduced below:




FIG. 1

47. Above, a host computer 126 communicates with a remote computer 124 over a communications network 114, such as the internet. The host computer 126 is the computer being controlled, while the remote computer 124 is the computer remotely controlling the host computer 126. The host computer 126 runs a Mach-derived operating system, such as MacOS, iOS, or iPadOS (herein, “Apple OS”). The remote computer can run any type of operating system.

48. Running on the host computer are at least two contexts: at least one user context 104, and at least one other context 108, labeled "Protocol Translator" in the figure. The user context 104 is an individual user's login session; e.g., the session for user "Al." Because Apple OSs are Mach-derived, the active user session (context) 104 has complete control of all device drivers, including the drivers for KVM and the network interface 112. This means that any other user sessions (e.g., user sessions "Betty," "Charles" and "Daniel") running on the host computer 126 have no access to KVM or the network interface, and thus cannot be controlled, either directly on the host computer 126, or remotely by the remote computer 124.

49. To solve this and other problems, the invention causes a process, called the "KVM Agent Sever" 106, to run in the user context 104. The invention also causes another process, called the "KVM Agent Client," to run in a context outside of the user context(s), e.g., the context labeled "Protocol Translator" 108. Data coming in from the remote computer 124—e.g., data indicating that user Al has moved the mouse—is received at the host computer 126 by network interface 112. In certain embodiments of the invention, the KVM Agent Client process 110, running in context 108, receives the mouse move data, processes it, and sends it via IPC across the context boundary (dashed line) to the KVM Agent Server process running in Al's user context 104. IPC is necessary because the KVM Agent Client and KVM Agent Server are separate processes running in separate contexts. The KVM Agent Server receives the mouse-move data, processes it, and causes the mouse to move accordingly within Al's user session.

50. The reverse then happens. Once the display state is updated in Al's user session, reflecting the new position of the mouse, the KVM Agent Server sends the new display state, via IPC, across the process boundary (dashed line) to the KVM Agent Client running in context 108. In certain embodiments of the invention, the KVM Agent Client processes the display state data

and sends it, via network interface 112, to the remote computer 124. The display on remote computer 124 then updates to show the new position of the mouse within Al's user session.

51. Because, in certain embodiments, control of the network interface 112 is assigned to the Protocol Translator 108, which sits outside the user contexts, multiple user sessions (Al, Betty, Charles, Daniel) can be simultaneously controlled on the host computer. In these embodiments, separate KVM Agent Server processes are established within each user session. When mouse move data from another user (e.g., Charles), sitting at a remote computer, arrives at the network interface 112, the KVM Agent Client 110 receives it, processes it, and routes it to the KVM Agent Server process running in Charles's user session. After the display in Charles's user session is updated, the KVM Agent Server process in his session forwards the updated display state to the KVM Agent Client, which sends it via network interface 112 to Charles's remote computer 124. In this way, in these embodiments, the single host computer can simultaneously host multiple remote sessions—something previously not possible on Mach-derived systems.

52. The inventive system has other advantages as well. By splitting functions between the KVM Agent Server and KVM Agent Client, the invention allows a remotely-controlled user session to run in the background of the host system, with the display suppressed—something previously not possible on Apple OS devices. Further, the invention increases security by reducing the number of resources that are directly exposed to the network interface. Still further, the invention eliminates the need for each new remote session to set up, tear down, and then re-establish a connection with the remote computer, which frees up system resources and reduces delays and connectivity issues.

## DEFENDANT AND THE ACCUSED INSTRUMENTALITIES

53. Plaintiffs repeat and reallege each of the allegations set forth in Paragraphs 1-52

*supra* as if fully set forth herein.

54. Defendant GoTo is a leading provider of remote access, IT, and collaboration software. According to its website, GoTo is "one of the world's largest SaaS companies – with more than 2,500 global employees, nearly $1 billion in annual revenue, and tens of millions of users." *See* **Exhibit 11** (https://www.goto.com/company/about-us, accessed July 22, 2026).

55. GoTo sells a suite of remote access software products (the "GoTo Remote Suite" or the "Accused Instrumentalities"). The GoTo Remote Suite includes:

a. **LogMeIn Pro** – According to GoTo's website, LogMeIn Pro is "Ranked the #1 most reliable remote access tool for SMBs [small and medium businesses]." https://www.logmein.com/products/pro?_ics=1784747238113&irclickid=~1UXOEyCvxvukld~bde7c5WXMRWOPRNIGNSQOPFGFAsj-83XUNLIz (accessed July 22, 2026). LogMeIn Pro allows "[f]ast, easy remote desktop access to your PC or Mac from your browser, desktop, or iOS and Android." *Id.* LogMeIn Pro allows a user, sitting at a remote computer, to "Quickly access your [host] computer as if you were sitting in front of it." *Id.* To operate LogMeIn Pro, the user must first install "Host" software on the host computer (i.e., the computer that is to be remotely controlled). https://support.logmein.com/pro/help/logmein-c-lmi-systemrequirements-host (accessed July 22, 2026). The host computer can be, *inter alia,* any "Apple Mac" running "macOS (High Sierra or newer)." *Id.* Once the Host software is installed, the user can, "[o]n a different computer, go to LogMeIn.com and log in with [their] email address and password." https://support.logmein.com/pro/help/come-funziona-logmein-c-common-easy (accessed July 22, 2026). The user "select[s] the computer [they] want to control," and "[l]og[s] in with [their] computer user name and password." *Id.* At that point, the user

has full remote control of the host computer. *Id.* LogMeIn Pro also allows users to remotely control the host computer from an iOS or Android device, via an App. *Id.*

b. **GoToMyPC:** According to GoTo's website, GoToMyPC is "[t]he industry standard for remote computer access for 20+ years." https://get.gotomypc.com/ (accessed July 22, 2026). Like LogMeIn Pro, GoToMyPC is remote desktop software: "Once GoToMyPC is installed on your desktop, you can start a remote PC connection from any device via the online portal. Just press Connect, and your files, applications and network will appear as if you were sitting right in front of your computer. It's really that simple." *Id.* The host computer can be a Mac running MacOS: "You can use GoToMyPC to access your Mac from a PC, your PC from a Mac, your Mac from a Mac or your PC from a PC." *Id.* To operate GoToMyPC, the user first installs a "small footprint server .. on the computer to be accessed." **Exhibit 42** (GoToMyPC White Paper: Technology). Once that is done, "[o]n the client side, the remote or mobile worker launches a browser, visits the secure GoToMyPC website, enters a user name/password and clicks on a 'connect' button for the desired computer, sending an SSL-authenticated, encrypted request to the broker." *Id.* At that point, the user has complete control of the host computer. *Id.*

c. **LogMeIn Resolve:** According to GoTo's website, LogMeIn Resolve is "All-in-one- IT management software, made simple." https://www.logmein.com/products/resolve?_ics=1784749263389&irclickid=~1UXOEyCvxvukld~bde7c5WXMRWOPRNIGNSQOPFGFAsj-83XUNLIz (accessed July 22, 2026). LogMeIn Resolve includes an "unattended remote access" feature that works on, *inter alia*, "Mac … devices." *Id.* The remote access feature allows IT departments to remotely "view and control computers or servers – without an end user present."

https://www.logmein.com/features/resolve/unattended-remote-access (accessed July 22, 2026). It also allows IT departments to "remotely view any iPhone or iPad running iOS 11+." https://www.logmein.com/pricing/resolve (accessed July 22, 2026). IT department personnel, called "agents" in LogMeIn parlance, can mass deploy host software to employee MacOS computers via "Agent Console" software. https://support.logmein.com/resolve/help/how-can-i-mass-deploy-the-installer (accessed July 22, 2026). LogMeIn Resolve also allows agents to request, via email or messaging link, that employees install an "applet" to begin an "instant support session," without having to install dedicated host software. https://support.logmein.com/resolve/help/working-with-attended-support-sessions (accessed July 22, 2026). Once the host software or applet is running, the agent can then take complete direct control of the employee's MacOS computer. *Id.* ("Mac: Remote View, Yes; Remote Control, Yes"). On iOS devices, the agent can only view, not control, the user's screen, after the user downloads and installs the "LogMeIn Resolve Agent app." *Id.* ("iOS: Remote View, Yes; Remote Control, No").

d. **LogMeIn Rescue:** According to GoTo's website, LogMeIn Rescue is "Enterprise Remote Support as tough as you," which is "Trusted for more than 1 billion remote sessions," and used by companies including Geek Squad, Symantec, 3M, GE, and Canon. https://www.logmein.com/products/rescue (accessed July 23, 2026). LogMeIn Rescue allows IT departments to "Reach any user on any platform with seamless support," including "Mac OS High Sierra+" and "iOS 16+." *Id.* It allows IT departments to "Access a device in 20 seconds or less, without pre-installed software" on the host device, to allow "Remote control" and "Screen sharing." https://www.logmein.com/features/rescue

(accessed July 23, 2026). To use the software, IT personnel install the "Desktop Technician Console" on their computer. https://support.logmein.com/rescue/help/about-the-technician-console-desktop-app (accessed July 23, 2026). The Desktop Technician Console "allows technicians to connect securely to end-users' computers from any location." *Id.* End-users, meanwhile, can access LogMeIn Rescue via several means, including the "LogMeIn Rescue applet," "Calling Card," and "Instant Chat." https://support.logmein.com/rescue/help/understanding-the-customer-experience (accessed July 23, 2026). To start a session, the technician has a number of options, including: (i) sending the customer a unique session PIN code, which the user can then enter at a PIN code entry site, http://www.logmein123.com, which downloads the Rescue applet onto the user's computer and starts a session (https://support.logmein.com/rescue/help/avvio-di-una-sessione-pc-mac-con-codice-pin-rescue-tc-t-resc-tc-sessionpin) (accessed July 23, 2026); (ii) emailing the customer a link which, when the customer clicks it, downloads the applet and starts a session (https://support.logmein.com/rescue/help/avvio-di-una-sessione-pc-mac-con-e-mail-rescue-tc-t-resc-tc-sessionlinkemail) (accessed July 23, 2026); or (iii) sending the user a link which, when the user clicks it, downloads the applet and starts a session (https://support.logmein.com/rescue/help/t-resc-tc-sessionlink) (accessed July 23, 2026). Once the session is started, the technician has full remote control over the user's computer, including a computer running MacOS. https://support.logmein.com/rescue/help/how-can-i-remote-control-a-customers-mac-running-macos-catalina (accessed July 23, 2026).

e. **LogMeIn Central:** According to GoTo's website, LogMeIn Central is a "Category-leading IT Solution" that has "Powered over 3.3B+ remote access sessions."

https://www.logmein.com/products/central (accessed July 23, 2026). LogMeIn Central allows both "Internal IT Teams" and "Managed Service Providers" to "Keep [their] business – and [their] customers – up and running with the #1 most reliable remote control." *Id.* To use LogMeIn Central, "Host software" must be installed on "the computer you want to access remotely." https://support.logmein.com/central/help/central-c-lmi-systemrequirements-host (accessed July 23, 2026). Host software can be installed on "Apple Macs" running "MacOS (High Sierra or newer)." IT personnel can begin remote sessions with users running Host software via the LogMeIn Client, which is either a standalone desktop app or a web app. https://support.logmein.com/central/help/installing-logmein-host-software-add-a-computer-central-t-lmi-installing (accessed July 23, 2026). Once a remote session is established, the technician has complete control over the user's computer. https://support.logmein.com/central/help/central-c-remotecontrol-starting.

56. GoTo's product documentation indicates that the remote desktop functionality of each product within the GoTo Remote Suite works in substantially the same way. For instance, the GoTo Data Sheet "Remote Access & Support" (**Exhibit 12** hereto) indicates that LogMeIn Resolve, LogMeIn Central, and LogMeIn Rescue all have the same "Core Support Functionality" of "Clientless Remote Support (Control and View)" for "Mac" and "iOS (Remote View Only)." Ex. 12 at 2. Another GoTo document, "Choosing the Remote Solution that Fits Your Needs" (**Exhibit 13**), similarly indicates that GoToMyPC, LogMeIn Pro, and LogMeIn Central all provide the same "best-in-class remote access," which is "Mac and PC compatible," provides "[u]nlimited remote access to 1 or more computers," and allows "desktop sharing." *Id.* Thus, on information and belief, the remote desktop functionality of each product in the GoTo Remote Suite works in substantially the same way, such that if one of them infringes the Patents-in-Suit, they all do.

**DEFENDANT'S PRE-SUIT KNOWLEDGE OF THE PATENTS-IN-SUIT**

57. Plaintiffs repeat and reallege each of the allegations set forth in Paragraphs 1-56 *supra* as if fully set forth herein.

58. On information and belief, GoTo had pre-suit knowledge of the Patents-in-Suit, and pre-suit knowledge (or willful blindness) that the GoTo Remote Suite products infringe the Patents-in-Suit, including through, at least, the extensive publicity surrounding Plaintiffs' prior lawsuits against companies selling highly similar software.

59. Plaintiffs have previously filed at least five lawsuits in federal court asserting infringement of one or more of the Patents-in-Suit. These include: (i) *Aqua Connect, Inc. et al. v. Apple, Inc.*, C.D. Cal. No. 17-cv-01762 (filed October 10, 2017); (ii) *Aqua Connect, Inc. et al. v. Parallels, Inc.,* D. Del. No. 18-cv-00454 (filed March 25, 2018); (iii) *Aqua Connect, Inc. et al. v. Splashtop, Inc.*, D. Del. No. 18-cv-00455 (filed March 25, 2018); (iv) *Aqua Connect, Inc. et al. v. TeamViewer US, Inc.,* D. Del. No. 18-cv-01572 (filed October 11, 2018); and (v) *Aqua Connect, Inc. et al. v. Team Viewer GmbH*, D. Del. No. 19-cv-02286 (filed December 17, 2019). Plaintiffs also filed an ITC complaint against Apple on October 10, 2017, which was instituted as *In the Matter of Certain Personal Computers, Mobile Devices, Digital Media Players, and Microconsoles,* Investigation No. 337-TA-1083.

60. Plaintiffs' prior lawsuits asserting the Patents-in-Suit received substantial publicity. *See, e.g.,* **Exhibit 14** (11/21/2017 IPWatchdog article on ITC investigation); **Exhibit 15** (11/14/2017 Mashable article on ITC investigation); **Exhibit 16** (11/14/2017 Apple Insider article on ITC investigation); **Exhibit 17** (8/12/2022 Law360 article reporting Plaintiffs' $5.7 million jury verdict in TeamViewer lawsuit); **Exhibit 18** (TopVerdict article listing TeamViewer verdict as among top 50 commercial jury verdicts in 2022). These articles expressly identify the Patents-in-

Suit, and explain that Plaintiffs asserted those patents against remote desktop / screen sharing software for MacOS computers. Ex. 14 at 1-3; Ex. 15 at 1-2; Ex. 16 at 1-3; Ex. 17 at 1. Exhibits 17-18 note that Plaintiffs obtained a $5.7 million verdict, one of the top 50 verdicts of 2022, against TeamViewer for its sale of software "for remotely accessing Apple operating systems."

61. On information and belief, as a large and sophisticated company selling remote desktop software, GoTo regularly monitors intellectual property developments in the remote desktop software industry, including patent lawsuit filings and verdicts. On information and belief, through its regular monitoring of such developments, GoTo learned, by no later than August 2022: (i) of the existence of each of the Patents-in-Suit, through at least the public reporting of Plaintiffs' prior lawsuits discussed above; (ii) that the Patents-in-Suit cover aspects of remote desktop software on MacOS devices, through at least the public reporting on Plaintiffs' prior lawsuits discussed above; that (iii) a key competitor of GoTo, TeamViewer, was found to infringe the Patents-in-Suit through its sale of competing remote desktop software for MacOS devices; and (iv) that a jury entered a large verdict against TeamViewer for that infringement.

62. GoTo's website demonstrates that GoTo considers TeamViewer a particularly important competitor. An entire section of GoTo's website is devoted to telling potential customers that "It's Time to Break Up with TeamViewer." **Exhibit 19** (screenshots from https://www.logmein.com/resources/logmein-vs-teamviewer, taken July 23, 2026) at 1. GoTo asks potential customers whether they are "in a toxic relationship with TeamViewer," pointing out "warning signs" like "paying far more than you budgeted because of hidden fees" and being "fooled by sneaky renewal clauses or hit with sudden price hikes." *Id.* By comparison, GoTo markets itself as a "Real IT Partner" that "delivers where TeamViewer falls short." *Id.* at 2. GoTo notes that it is "constantly evolving to meet your changing needs—unlike TeamViewer, which

struggles to keep up." *Id.* GoTo then induces TeamViewer customers to switch to GoTo by offering "up to 12 months free" and "Special pricing … when you switch to LogMeIn." *Id.* at 4.

63. Given the close competitive relationship between GoTo and TeamViewer, on information and belief, GoTo learned of the jury verdict against TeamViewer on or about the time it was entered and reported in August 2022. On information and belief, given the similarities between GoTo's software and the software that was found to infringe in the TeamViewer case, after learning of the jury verdict, GoTo conducted an infringement analysis to investigate whether its software also infringed the Patents-in-Suit. On information and belief, for the reasons set forth in Paragraphs 70-71, 91-92 *infra*, that analysis—if performed in good faith—could only have concluded that the GoTo Remote Suite does infringe the Patents-in-Suit. Thus, on information and belief, from August 2022 to the present, GoTo has known that the GoTo Remote Suite infringes the Patents-in-Suit. Or, if GoTo failed to conduct an infringement analysis, on information and belief, given the similarities between the GoTo Remote Suite and the products found to infringe in the TeamViewer case, it was willfully blind as to the fact that the GoTo Remote Suite infringes.

## PATENT MARKING

64. In this action, Plaintiffs assert the method claims, and only the method claims of the Patents-in-Suit. Specifically, Plaintiffs allege only that GoTo has infringed one or more of: (i) claims 1-7, 10-26, 30-32, and 35 of the '386 Patent; and (ii) claims 1-7, 10-26, 30-32, and 35-42 of the '502 Patent, all of which are method claims. Plaintiffs do not, and will not, allege that GoTo has infringed any of: (i) claims 8, 27-29, or 33-34 of the '386 Patent, which are system claims; (ii) claims 8, 27-29 or 33-34 of the '502 Patent, which are system claims; (iii) claim 9 of the '386 Patent, which is a computer-readable storage media claim; or (iv) claim 9 of the '502 Patent, which is a computer-readable storage media claim.

65. Because Plaintiffs are asserting method claims, and only method claims, of the Patents-in-Suit, the patent marking statute, 35 U.S.C. § 287, does not apply. *See Crown Packaging Tech., Inc. v. Rexam Beverage Can Co.,* 559 F.3d 1308, 1316 (Fed. Cir. 2009) ("35 U.S.C. § 287(a) d[oes] not apply where the patentee only assert[s] the method claims of a patent which include[s] both method and apparatus claims") *(citing Hanson v. Alpine Valley Ski Area, Inc.*, 718 F.2d 1075 (Fed.Cir.1983)).

66. Therefore, Plaintiffs need not plead or prove compliance with the patent marking statute in order to be entitled to presuit damages.

**<u>COUNT I – DIRECT INFRINGEMENT OF THE '386 PATENT</u>**

67. Plaintiffs repeat and reallege each of the allegations set forth in Paragraphs 1-66 *supra* as if fully set forth herein.

68. GoTo has directly infringed at least one method claim of the '386 patent by using the GoTo Remote Suite products in the United States. On information and belief, GoTo's headquarters is located in Boston, Massachusetts, within the United States. On information and belief, in connection with developing, testing, supporting and marketing the GoTo Remote Suite products, GoTo personnel and/or agents located in the United States, including at its Boston headquarters, have used, and do use, the GoTo Remote Suite products in their intended fashion. Such use infringes at least one method claim of the '386 patent, as shown below.

69. For example[1], claim 25 of the '386 patent recites (with element identifiers added for convenience):

**25(pre)** A computer-implemented method for execution on a computing device

[1] The patent claims identified herein are exemplary, not exhaustive. Plaintiffs will provide their full list of the asserted claims (all of which will be <u>method claims only</u>) at the appropriate time(s) under this Court's Default Standard for Discovery, the Local Rules, and the Scheduling Order.

comprising at least one computer processor and at least one computer memory, and wherein the computing device is configured to be coupled to a communications network communicating with a Mach-derived computing device comprising at least one computer processor and at least one computer memory, the method comprising:

**25(a)** receiving, by the at least one computer processor of the computing device, an update to a user instance, wherein the update is received from the Mach-derived system computing device; and

**25(a)(1)** wherein the update was previously transmitted by the Mach-derived computing device over the communications network, and

**25(a)(2)** wherein data corresponding to the update to the user instance was previously transferred over a computer system communication facility of the Mach-derived computing device,

**25(a)(3)** wherein the data corresponding to the update to the user instance transferred comprises at least one of: user computer data, or metadata corresponding to a shared memory, wherein said shared memory comprise any portion of the updated user computer data,

**25(a)(4)** wherein the at least one of the user computer data or the metadata was transmitted via the computer system communication facility wherein the computer system communication facility comprises at least one of: a socket, a file, a port, a shared computer memory, or a pipe,

**25(a)(5)** wherein the data corresponding to the update to the user instance was created on the Mach-derived computing device,

**25(a)(6)** wherein the Mach-derived computing device comprises a

user computer context comprising an agent server,

**25(a)(6)(i)** the agent server associated with an agent client

**25(a)(6)(ii)** wherein the agent client and the agent server execute on the Mach-derived computing device,

**25(a)(6)(iii)** the agent client executing in a process separate from and in a separate Mach context from the agent server,

**25(a)(7)** wherein the data corresponding to the update to the user instance was generated by the agent server corresponding to the updated user instance,

**25(a)(8)** wherein the data corresponding to the updated user instance comprises the user computer data.,

**25(a)(9)** wherein the user computer data comprises at least one of: display data, audio data, biometric data, input data, image data, output data, video data, streaming data, touch screen data, keypad data, joystick data, touch pad data., keyboard data, mouse data the metadata smart device data, input device data, data from another device appropriate for receiving input directly or indirectly from the user, computer monitor data, speaker data, projector data, data from another device appropriate for outputting data, or output device data;

**25(b)** transmitting, by the at least one computer processor of the computing device, input data received from at least one input device of the computing device, over the communications network to the Mach-derived computing device; and

**25(c)** outputting, by the at least one computer processor of the computing;

device, data included in the update of the user instance based on the data corresponding to the update to the user instance received from the Mach-derived computing device.

70. When they are used in their ordinary and intended fashion, the GoTo Remote Suite products practice each and every element of '386 claim 25, either literally or under the doctrine of equivalents. For example, looking at the functionality of LogMeIn Pro—which, as discussed in Paragraph 56 *supra*, on information and belief, performs remote access functionality in substantially the same way as the other products in the GoTo Remote Suite—the ordinary use of LogMeIn Pro meets each and every element of '386 claim 25, as shown below:

a. **25(pre)**: To the extent the preamble is limiting, which Plaintiffs do not concede, LogMeIn Pro includes both "host" and "client" software. *See* **Exhibit 20** (https://support.logmein.com/pro/help/come-funziona-logmein-c-common-easy, accessed July 24, 2026); **Exhibit 21** (https://support.logmein.com/pro/help/whats-the-difference-between-a-host-and-a-client, accessed July 24, 2026). The "host" software runs on the computer to be controlled, while the "client" software runs on the remote computer that will control the host computer. *Id.* There are at least four versions of the client software: (i) a web-based application on the LogMeIn.com website; (ii) a standalone client app; (iii) an iOS client app; and (iv) an Android client app. Ex. 21 at 4-5. Each version of the client software runs a "computer-implemented method for execution on a computing device comprising at least one computer process and at least one computer memory." *See* **Exhibit 22** (https://support.logmein.com/pro/help/logmein-c-lmi-systemrequirements-client, accessed July 24, 2026) (indicating that the client software can run on "PC and Mac … Operating Systems" for the standalone app, "PC and Mac client-side browser" for the

browser app, and "any iOS or Android device" for the mobile app). The client device must be "coupled to a communication network," i.e., the Internet. *Id.* at 2 (indicating the client device must have an "Internet connection.") The client device can communicate over the Internet with a MacOS host device, which is "a Mach-derived computing device comprising at least one computer processor and at least one computer memory." *See* **Exhibit 23** (https://support.logmein.com/pro/help/logmein-c-lmi-systemrequirements-host, accessed July 24, 2026) (indicating that the host software can run on "Apple Macs" running "MacOS (High Sierra or newer))"; **Exhibit 24** (https://developer.apple.com/library/archive/documentation/Darwin/Conceptual/KernelProgramming/Mach/Mach.html, accessed July 24, 2026) ("The fundamental services and primitives of the OS X kernel are based on Mach 3.0"). Thus, to the extent the preamble is limiting, the ordinary use of LogMeIn Pro literally meets every element thereof.

b. **25(a)**; When a user is using the LogMeIn Pro client software, the client software receives "updates to a user instance"—e.g., updated screen data, showing the current state of the screen—from the LogMeIn Pro host software running on the MacOS (i.e., "Mach-derived") host computer. *See, e.g.,* **Exhibit 25** (https://support.logmein.com/pro/help/logmein-c-remotecontrol-starting, accessed July 24, 2026) at 2 ("Once you have launched remote control and successfully authenticated to the host computer, you see the host computer's desktop"); **Exhibit 26** (https://support.logmein.com/pro/help/how-to-view-the-host-computer-in-full-screen-mode-logmein-t-remotecontrol-fullscreen, accessed July 24, 2026) ("In full screen mode the host display covers the entire client display. Full Screen mode gives you the most realistic 'as if you were there' experience.") Thus, the ordinary use of LogMeIn Pro meets

this element, literally and/or under the doctrine of equivalents ("DOE").

c. **25(a)(1)**: The data that the client computer receives from the host computer—such as updated screen data—is transmitted by the MacOS ("Mach-derived") host computer to the client computer over the Internet ("communications network.") *See* Exhibit 22 at 2 (client receives updates over "Internet connection" from host). Thus, ordinary use of LogMeIn Pro meets this element, literally and/or under the DOE.

d. **25(a)(2):** When the LogMeIn Pro host software is installed and executed on a MacOS computer, a number of processes are started. One is the process "LogMeIn," which runs in the root session. Another is the process "LMIGUIAgent," which runs in a user session. Additionally, at startup, MacOS launches the "WindowServer" process, which runs in the "_windowserver" user session. During an active remote session, the LMIGUIAgent process exchanges updated user session data—i.e., "update[s] to a user instance", including mouse move data, updated screen state data, etc.—with the WindowServer process. These updates are exchanged via Mach ports, which are a "system communication facility of the Mach-derived computing device." These updates are exchanged between the WindowServer and LMIGUIAgent processes running on the host computer before the updated user session data is transmitted to the client computer—i.e., the "data corresponding to the update to the user instance was ***previously*** transferred over a computer system facility of the Mach-derived computing device." Thus, ordinary use of LogMeIn Pro meets this element, literally and/or under the DOE.

e. **25(a)(3):** The updated user session data that is exchanged between the WindowServer and LMIGUIAgent processes running on the host computer comprise "user computer data," including updated screen state data, mouse move data, etc. Thus, the

ordinary use of LogMeIn Pro meets this element, literally and/or under the DOE.

f. **25(a)(4):** As discussed above with respect to element 25(a)(2), before being transmitted over the network, the "user computer data" (e.g., screen update data) was exchanged between LMIGUIAgent and WindowServer on the host computer using Mach ports, which are "a port" and a "computer system communication facility." Thus, the ordinary use of LogMeIn Pro meets this element, literally and/or under the DOE.

g. **25(a)(5):** The data exchanged between LMIGUIAgent and WindowServer (e.g., updated screen state data) is created on the host MacOS computer, i.e., the Mach-derived computing device. Thus, the ordinary use of LogMeIn pro meets this element, literally and/or under the doctrine of equivalents.

h. **25(a)(6):** The LMIGUIAgent process, running in a user session, is an "agent server" in a "user computer context" (the user session). Thus, the ordinary use of LogMeIn Pro meets this element literally and/or under the doctrine of equivalents.

i. **25(a)(6)(i):** The LogMeIn process running in the root session is an "agent client." The agent client (LogMeIn) and agent server (LMIGUIAgent) are "associated" with each other in that they work together and exchange data to perform the functions of the LogMeIn Pro software. Thus, the ordinary use of LogMeIn Pro meets this element, literally and/or under the doctrine of equivalents.

j. **25(a)(6)(ii):** LogMeIn, running in root (agent client), and LMIGUIAgent, running in user (agent server), both execute on the MacOS host, the "Mach-derived computing device." Thus, the ordinary use of LogMeIn Pro meets this element, literally and/or under the doctrine of equivalents.

k. **25(a)(6)(iii):** LMIGUIAgent and LogMeIn are separate processes. They

also execute in separate Mach contexts—LogMeIn in executing in root, and LMIGUIAgent executing in user. Thus, the ordinary use of LogMeIn Pro meets this element, literally and/or under the doctrine of equivalents.

l. **25(a)(7):** LMIGUIAgent (the agent server) generates data corresponding to updates to the user instance (e.g., data indicating updates to the display state), which it then passes to the remote computer via the Internet. Thus, the ordinary use of LogMeIn Pro meets this element, literally and/or under the doctrine of equivalents.

m. **25(a)(8)/(9):** As discussed above, LMIGUIAgent generates data corresponding to updates to the user instance, including "display data" (data reflecting current state of the display screen), "audio data" (active audio playing in the user session), and many others. Thus, the ordinary use of LogMeIn Pro meets these elements, literally and/or under the doctrine of equivalents.

n. **25(b):** When the user at the client computer enters input (e.g., moves the mouse), the LogMeIn Pro client software running on the "processor" of that computer transmits "input data" (e.g., data reflecting the movement of the mouse) over the Internet ("communications network") to the MacOS host computer ("Mach-derived computing device"). Thus, the ordinary use of LogMeIn Pro meets this element, literally and/or under the doctrine of equivalents.

o. **25(c):** After the LogMeIn Pro host software sends data indicating an "update of the user instance" (e.g., new screen state) to the client computer, the LogMeIn Pro client software running on that computer "outputs" the updated data, e.g., by updating the state of the display screen on the client computer. Thus, the ordinary use of LogMeIn Pro meets this element, literally and/or under the doctrine of equivalents.

71. Thus, the ordinary use of LogMeIn Pro meets every element of claim 25 of the ‘386 patent, literally and/or under the doctrine of equivalents. Accordingly, the ordinary use of LogMeIn Pro constitutes direct infringement of at least claim 25 of the ‘386 patent.

72. As discussed in Paragraph 56 *supra*, on information and belief, the remote access functionality of the other products in the LogMeIn Remote Suite—i.e., GoToMyPC, LogMeIn Resolve, LogMeIn Rescue, LogMeIn Central—operates in substantially the same way as the remote access functionality of LogMeIn Pro. Thus, for substantially the same reasons shown in Paragraphs 70-71 *supra*, the ordinary use of GoToMyPC, LogMeIn Resolve, LogMeIn Rescue, and LogMeIn Central directly infringes at least method claim 25 of the ‘386 Patent.

73. Accordingly, GoTo has directly infringed method claims of the ‘386 Patent, and continues to directly infringe method claims of the ‘386 Patent, by using, directly and/or through one or more agents, the LogMeIn Remote Suite of products in the Untied States. GoTo is liable to Plaintiffs for such infringement under 35 U.S.C. § 271(a).

**<u>COUNT II – INDUCED INFRINGEMENT OF THE ‘386 PATENT</u>**

74. Plaintiffs repeat and reallege each and every allegation in Paragraphs 1-73 *supra* as if fully set forth herein.

75. GoTo has unlawfully induced infringement of at least one method claim of the ‘386 patent by selling the GoTo Remote Suite of products to U.S. customers, and expressly instructing such customers on how to use the GoTo Remote Suite in a manner that infringes the ‘386 patent’s method claims, all while knowing of the ‘386 patent, and knowing (or being willfully blind) that ordinary use of the GoTo Remote Suite infringes method claims of the ‘386 patent.

76. As shown in Paragraphs 70-73 *supra*, ordinary use of the GoTo Remote Suite of products constitutes direct infringement of at least method claim 25 of the ‘386 Patent.

Accordingly, when GoTo's U.S. end-customers use the GoTo Remote Suite in the ordinary and intended fashion, such use constitutes infringement of at least method claim 25 of the '386 Patent.

77. GoTo provides extensive instruction and assistance to its end-users, explicitly instructing them on how to use the GoTo Remote Suite in their ordinary (and thus infringing) way. For instance, on its website, GoTo publishes extensive instructions and technical support, instructing users on how to perform every step of installing and using the GoTo Remote Suite. *See, e.g.,* Ex. 20 ("Get Started" page for LogMeIn Pro, showing each step user must follow to install and use LogMeIn Pro), **Exhibit 27** (https://support.logmein.com/pro/help#__browse-tree-title-get-started--install-the-host-software, accessed July 27, 2026) (page with detailed instructions on how to install the LogMeIn Pro host software); **Exhibit 28** (https://support.logmein.com/pro/help#__browse-tree-title-remote-control-procedures--remote-control-from-a-pc-or-mac, accessed July 27, 2026) (page with detailed instructions on how to start a remote control session from a PC or Mac in LogMeIn Pro); **Exhibit 29** (https://support.gotomypc.com/help/what-is-gotomypc, accessed July 27, 2026) ("Fundamentals" page for GoToMyPC, explaining basics of how to install and use the software); **Exhibit 30** (https://support.gotomypc.com/help#__browse-tree-title-get-started--installation, accessed July 27, 2026) (page with detailed installation instructions for GoToMyPC); **Exhibit 31** (https://support.gotomypc.com/help#__browse-tree-title-core-features--remote-access, accessed July 27, 2026) (page with detailed instructions on how to set up remote sessions in GoToMyPC); **Exhibit 32** (https://support.logmein.com/resolve/help#__browse-tree-title-get-started--set-up-and-sign-in, accessed July 27, 2026) (page with instructions on how to set up and sign in to LogMeIn Resolve); **Exhibit 33** (https://support.logmein.com/resolve/help/working-with-attended-support-sessions, accessed July 27, 2026) (page with instructions on how to start a

LogMeIn Resolve support session (remote control)); **Exhibit 34** (https://support.logmein.com/rescue/help#__browse-tree-title-logmein-rescue-fundamentals--about-rescue, accessed July 27, 2026) (page with basic help information about installing and using LogMeIn Rescue); **Exhibit 35** (https://support.logmein.com/rescue/help/ten-things-to-try-getting-started-with-rescue, accessed July 27, 2026) ("Ten things to try" page with explanation of main functionality of LogMeIn Rescue); **Exhibit 36** (https://support.logmein.com/rescue/help#__browse-tree-title-remote-control--control-a-customer-s-computer, accessed July 27, 2026) (page with instructions on how a technician can use LogMeIn Rescue to control a customer's computer); **Exhibit 37** (https://support.logmein.com/central/help#__browse-tree-title-get-started--about-your-account, accessed July 27, 2026) (page with instructions on how to setup and install LogMeIn Central); **Exhibit 38** (https://support.logmein.com/central/help#__browse-tree-title-remote-control-procedures--connect-to-a-host-computer, accessed July 27, 2026) (page with instructions on how to use LogMeIn Central to control a host computer).

78. GoTo also offers 24/7 phone support, a support site, forum/community support, and (for some products) dedicating onboarding/hands-on support services for the GoTo Remote Suite of products. *See, e.g.,* **Exhibit 39** (https://get.gotomypc.com/plansandpricing?utm_source=logmein.com&utm_medium=referral&utm_campaign=hp-nav&_gl=1*1qzykoy*_gcl_aw*R0NMLjE3ODQyMzEyMTQuQ2owS0NRandndUxTQmhETEFSSXNBSC15UHJIOTN1eDdqV3AwQ1Z0WEhxNHNKUUM2RnZxdUstN2I5MDRJQnljTTEzUktvdEFWZ0R0cXNUMGFBakFhRUFMd193Y0I.*_gcl_dc*R0NMLjE3ODQyMzEyMTQuQ2owS0NRandndUxTQmhETEFSSXNBSC15UHJIOTN1eDdqV3AwQ1Z0WEhxNHNKUUM2

RnZxdUstN2I5MDRJQnljTTEzUktvdEFWZ0R0cXNUMGFBakFhRUFMd193Y0I.*_gcl_au*ODQ4MDMzMDE0LjE3ODI5NDIwOTk., accessed July 27, 2026) (page indicating GoTo provides such support for GoToMyPC customers); **Exhibit 40** (https://www.logmein.com/pricing/central, accessed July 27, 2026) (page indicating GoTo provides "Premium Customer Support" for LogMeIn Central customers); **Exhibit 41** (https://www.logmein.com/pricing/rescue, accessed July 27, 2026) (page indicating GoTo provides "White Glove Onboarding," "24/7/365 Phone Support," and "Dedicated Technical Amount Manager Team," a "Dedicated Support Number," and other support services for LogMeIn Rescue customers); **Exhibit 43** (https://www.logmein.com/pricing/resolve, accessed July 27, 2026) (page indicating GoTo provides "Support Center," "Community Support," and "Live Email/Chat/Phone Customer Support" services for LogMeIn Resolve customers). On information and belief, by providing such support resources and services, GoTo directs, instructs, and assists its end-customers in how to use the GoTo Remote Suite of products in their ordinary, and thus infringing, manner.

79. The acts of GoTo described in Paragraphs 77-78 *supra*—including publishing extensive instructions on how to use the GoTo Remote Suite in an infringing manner, and providing active support to end-users in doing so—constitute acts by which GoTo actively induced, and continues to induce, its customers to infringe the method claims of the '386 Patent.

80. As discussed in Paragraphs 57-63 *supra*, on information and belief, when GoTo committed the inducing acts complained of above, it: (i) knew of, or was willfully blind to, the existence of the '386 patent; and (ii) knew of, or was willfully blind to, the fact that its end-users' ordinary use of the GoTo Remote Suite infringed method claims of the '386 Patent.

81. Accordingly, for the foregoing reasons, GoTo is liable to Plaintiffs for induced infringement of the method claims of the '386 patent under 35 U.S.C. § 271(b).

**COUNT III – CONTRIBUTORY INFRINGEMENT OF THE '386 PATENT**

82. Plaintiffs repeat and reallege each of the allegations set forth in Paragraphs 1-81 *supra* as if fully set forth herein.

83. GoTo has unlawfully contributed to infringement of the '386 patent by selling the GoTo Remote Suite of products to customers in the United States, where the GoTo Remote Suite constitutes a material part of the claimed invention, where GoTo knew the GoTo Remote Suite was especially adapted for use in infringement of the '386 patent, and where the GoTo Remote Suite are not staple articles or commodities of commerce suitable for non-infringing use.

84. As shown in Paragraphs 70-72 *supra*, when the GoTo Remote Suite of products are used in their ordinary and intended fashion, such use constitutes direct infringement of the method claims of the '386 patent. Accordingly, when GoTo's end-users use the GoTo Remote Suite in the United States, such use constitutes direct infringement of the method claims of the '386 Patent.

85. Because ordinary use of the GoTo Remote Suite directly infringes the method claims of the '386 Patent, the GoTo Remote Suite is a material or apparatus for use in practicing [the] patented process, constituting a material part of the invention.

86. As shown in Paragraphs 57-63 *supra*, on information and belief, when GoTo sold the GoTo Remote Suite to customers in the United States, it knew, or was willfully blind, that ordinary use of the GoTo Remote Suite directly infringed method claims of the '386 patent. Accordingly, when it made such sales, GoTo knew (or was willfully blind) that the GoTo Remote Suite was especially made or especially adapted for use in an infringement of the method claims of the '386 patent.

87. Finally, the GoTo Remote Suite products are not staple articles of commerce suitable for substantial non-infringing use. The infringing remote access functionality is the core

feature of each of the GoTo Remote Suite products. Accordingly, none of the GoTo Remote Suite products are suitable for substantial non-infringing use.

88. Accordingly, for the foregoing reasons, GoTo is liable to Plaintiffs for contributory infringement of the method claims of the ‘386 patent in violation of 35 U.S.C. § 271(c).

## COUNT IV – DIRECT INFRINGEMENT OF THE ‘502 PATENT

89. Plaintiffs repeat and reallege each of the allegations set forth in Paragraphs 1-88 *supra* as if fully set forth herein.

90. GoTo has directly infringed at least one method claim of the ‘502 patent by using the GoTo Remote Suite products in the United States. On information and belief, GoTo’s headquarters is located in Boston, Massachusetts, within the United States. On information and belief, in connection with developing, testing, supporting and marketing the GoTo Remote Suite products, GoTo personnel and/or agents located in the United States, including at its Boston headquarters, have used, and do use, the GoTo Remote Suite products in their intended fashion. Such use infringes at least one method claim of the ‘502 patent, as shown below.

91. For example, claim 25 of the ‘502 patent recites (with element identifiers added for convenience):

> **25(pre)** A method for execution on a computing device comprising at least one processor and at least one memory, and wherein the computing device is adapted to be coupled to a network for communication with a Mach-derived system comprising at least one processor and at least one memory, the method comprising:
>
> > **25(a)** receiving, by the at least one processor of the computing device, an update to a user instance, wherein the update is received from the Mach-derived system; and

**25(b)** wherein the update was previously transmitted by the Mach-derived system over the network, and

**25(c)** wherein data was previously transferred over a system communication facility of the Mach-derived system,

**25(c)(1)** wherein the data transferred comprises at least one of: user data, or metadata corresponding to a shared memory comprising any portion of the updated user data,

**25(d)** wherein the at least one of the user data or the metadata was transmitted via the system communication facility,

**25(d)(1)** wherein the system communication facility comprises at least one of: a socket, a file, a port, or a pipe,

**25(e)** wherein the data was created on the Mach-derived system,

**25(f)** wherein the Mach-derived system comprises:

**25(f)(1)** a first context comprising an agent server,

**25(f)(2)** a second context comprising an agent client,

**25(f)(3)** wherein the agent client and the agent server execute on the Mach-derived system the agent client executing in a process separate from the agent server,

**25(f)(4)** wherein the data was generated by the agent server corresponding to the updated user instance,

**25(f)(5)** wherein the data corresponding to the updated user instance comprises the user data,

**25(f)(6)** wherein the user data comprises at least one of: display

data, audio data, biometric data, input data, image data, output data, video data, streaming data, touch screen data, keypad data, joystick data, touch pad data, keyboard data, mouse data, the metadata smart device data, input device data, data from another device appropriate for receiving input directly or indirectly from the user, computer monitor data, speaker data, projector data, data from another device appropriate for outputting data, or output device data;

**25(g)** transmitting, by the at least one processor of the computing device, input data received from at least one input device of the computing device, over the network to the Mach-derived system; and

**25(h)** outputting, by the at least one processor of the computing device, data included in the update of the user instance based on the data received from the Mach-derived system.

92. When they are used in their ordinary and intended fashion, the GoTo Remote Suite products practice each and every element of '502 claim 25, either literally or under the doctrine of equivalents. For example, looking at the functionality of LogMeIn Pro—which, as discussed in Paragraph 56 *supra*, on information and belief, performs remote access functionality in substantially the same way as the other products in the GoTo Remote Suite—the ordinary use of LogMeIn Pro meets each and every element of '502 claim 25, as shown below:

a. **25(pre)**: To the extent the preamble is limiting, which Plaintiffs do not concede, LogMeIn Pro includes both "host" and "client" software. *See* Exhibit 20, Exhibit 21. The "host" software runs on the computer to be controlled, while the "client" software runs on the remote computer that will control the host computer. *Id*. There are at least four

versions of the client software: (i) a web-based application on the LogMeIn.com website; (ii) a standalone client app; (iii) an iOS client app; and (iv) an Android client app. Ex. 21 at 4-5. Each version of the client software runs a "method for execution on a computing device comprising at least one computer processor and at least one memory." *See* Exhibit 22 (client software runs on "PC and Mac … Operating Systems" for the standalone app, "PC and Mac client-side browser" for the browser, and "any iOS or Android device" for the mobile app.) The client device must be "coupled to a network for communication," *i.e.,* the Internet. *Id.* at 2 (indicating the client device must have an "Internet connection.") The client device can communicate over the Internet with a MacOS host device, which is "a Mach-derived system comprising at least one computer processor and at least one computer memory." *See* Exhibit 23 (indicating that the host software can run on "Apple Macs" running "MacOS (High Sierra or newer)"; Exhibit 24 ("The fundamental services and primitives of the OS X kernel are based on Mach 3.0."). Thus, to the extent the preamble is limiting, the ordinary use of LogMeIn Pro literally meets every element thereof.

b. **25(a):** When a user is using the LogMeIn Pro client software, the client software, running on a "processor" of the client computer, receives "updates to a user instance"—e.g., updated screen data, showing the current state of the screen—from the LogMeIn Pro host software running on the MacOS (i.e., "Mach-derived") host computer. *See, e.g.,* Exhibit 25 at 2 ("Once you have launched remote control and successfully authenticated to the host computer, you see the host computer's desktop"); Exhibit 26 ("In full screen mode the host display covers the entire client display. Full Screen mode gives you the most realistic 'as if you were there' experience.") Thus, the ordinary use of LogMeIn Pro meets this element literally and/or under the doctrine of equivalents.

c. **25(b):** The data that the client computer receives from the host computer—such as updated screen data—was previously transmitted by the MacOS ("Mach-derived") host computer to the client computer over the Internet ("network.") *See* Exhibit 22 at 2 (client receives updates over "Internet connection" from host). Thus, the ordinary use of LogMeIn Pro literally meets this element.

d. **25(c):** When the LogMeIn Pro host software is installed and executed on a MacOS computer, a number of processes are started. One is the process "LogMeIn," which runs in the root session. Another is the process "LMIGUIAgent," which runs in a user session. Additionally, at startup, MacOS launches the "WindowServer" process, which runs in the "_windowserver" user session. During an active remote session, the LMIGUIAgent process exchanges updated user session data—i.e., "update[s] to a user instance", including mouse move data, updated screen state data, etc.—with the WindowServer process. These updates are exchanged via Mach ports, which are a "system communication facility of the Mach-derived system." These updates are exchanged between the WindowServer and LMIGUIAgent processes running on the host computer before the updated user session data is transmitted to the client computer—i.e., the "data … was ***previously*** transferred over a computer system facility of the Mach-derived system." Thus, the ordinary use of LogMeIn Pro meets this element, literally and/or under the doctrine of equivalents.

e. **25(c)(1):** The updated user session data that is exchanged between the WindowServer and LMIGUIAgent processes running on the host computer comprise "user data," including updated screen state data, mouse move data, etc. Thus, the ordinary use of LogMeIn Pro literally meets this element.

f. **25(d):** As discussed above with respect to element 25(c), before being transmitted over the network, the "user data" (e.g., screen update data, mouse move data, etc.) was exchanged between LMIGUIAgent and WindowServer on the host computer using Mach ports, which are "a port" and a "computer system communication facility." Thus, the ordinary use of LogMeIn Pro meets this element literally and/or under the DOE.

g. **25(d)(1):** As discussed above, the user data is exchanged between LMIGUIAgent and WindowServer using Mach ports, which are "ports." Thus, the ordinary use of LogMeIn Pro meet this element literally and/or under the DOE.

h. **25(e):** The data (e.g., updated screen state data) exchanged over the system communication facility (Mach ports) was created on the host MacOS computer. Thus, the ordinary use of LogMeIn Pro meets this element literally and/or under the DOE.

i. **25(f):** As discussed above, the LogMeIn Pro host software can run on a MacOS computer, which literally meets this element.

j. **25(f)(1):** The MacOS computer running LogMeIn Pro has a user session, which is a first context. Thus, the ordinary use of LogMeIn Pro meets this element, literally and/or under the doctrine of equivalents.

k. **25(f)(2):** The MacOS computer running LogMeIn Pro has a root session, which is a second context. Thus, the ordinary use of LogMeIn Pro meets this element, literally and/or under the doctrine of equivalents.

l. **25(f)(3):** In operation, the LogMeIn process (agent client) is a separate process from the LMIGUIAgent process (agent server), and both processes run in different contexts: root session for the former, and user session for the latter. Thus, the ordinary use of LogMeIn Pro meets this element, literally and/or under the doctrine of equivalents.

m. **25(f)(4)-(6):** LMIGUIAgent, running in the active user session, generates and exchanges data, including updated screen state data (“user data” and “display data”), with WindowServer and/or LogMeIn. Thus, the ordinary use of LogMeIn Pro meets these elements, literally and/or under the DOE.

n. **25(g):** When the user at the client computer enters input (e.g., moves the mouse), the LogMeIn Pro client software running on the “processor” of that computer transmits “input data” (e.g., data reflecting the movement of the mouse) over the Internet (“network”) to the MacOS host computer (“Mach-derived system”). Thus, the ordinary use of LogMeIn Pro meets this element, literally and/or under the doctrine of equivalents.

o. **25(h):** After the LogMeIn Pro host software sends data indicating an “update of the user instance” (e.g., new screen state) to the client computer, the LogMeIn Pro client software running on that computer “outputs” the updated data, e.g., by updating the state of the display screen on the client computer. Thus, the ordinary use of LogMeIn Pro meets this element, literally and/or under the doctrine of equivalents.

93. Thus, the ordinary use of LogMeIn Pro meets all the elements of claim 25 of the ‘502 patent, literally and/or under the doctrine of equivalents. Accordingly, the ordinary use of LogMeIn Pro constitutes direct infringement of at least claim 25 of the ‘502 patent.

94. As discussed in Paragraph 56 *supra*, on information and belief, the remote access functionality of the other products in the LogMeIn Remote Suite—i.e., GoToMyPC, LogMeIn Resolve, LogMeIn Rescue, LogMeIn Central—operates in substantially the same way as the remote access functionality of LogMeIn Pro. Thus, for substantially the same reasons shown in Paragraphs 92-93 *supra*, the ordinary use of GoToMyPC, LogMeIn Resolve, LogMeIn Rescue, and LogMeIn Central directly infringes at least method claim 25 of the ‘502 Patent.

95. Accordingly, GoTo has directly infringed method claims of the ‘502 Patent, and continues to directly infringe method claims of the ‘502 Patent, by using, directly and/or through one or more agents, the LogMeIn Remote Suite of products in the Untied States. GoTo is liable to Plaintiffs for such infringement under 35 U.S.C. § 271(a).

**COUNT V – INDUCED INFRINGEMENT OF THE ‘386 PATENT**

96. Plaintiffs repeat and reallege each and every allegation in Paragraphs 1-95 *supra* as if fully set forth herein.

97. GoTo has unlawfully induced infringement of at least one method claim of the ‘502 patent by selling the GoTo Remote Suite of products to U.S. customers, and expressly instructing them on how to use the GoTo Remote Suite in a manner that infringes the ‘502 patent’s method claims, all while knowing (or willfully blind) of the ‘502 patent, and knowing (or willfully blind) that ordinary use of the GoTo Remote Suite infringes method claims of the ‘502 patent.

98. As shown in Paragraphs 92-94 *supra*, ordinary use of the GoTo Remote Suite of products constitutes direct infringement of at least method claim 25 of the ‘502 Patent. Accordingly, when GoTo’s U.S. end-customers use the GoTo Remote Suite in the ordinary and intended fashion, such use constitutes infringement of at least method claim 25 of the ‘502 Patent.

99. GoTo provides extensive instruction and assistance to its end-users, explicitly instructing them on how to use the GoTo Remote Suite in their ordinary (and thus infringing) way. For instance, on its website, GoTo publishes extensive instructions and technical support, instructing users on how to perform every step of installing and using the GoTo Remote Suite. *See, e.g.,* Ex. 20 (“Get Started” page for LogMeIn Pro, showing each step user must follow to install and use LogMeIn Pro), Ex. 27 (page with detailed instructions on how to install the LogMeIn Pro host software); Ex. 28 (page with detailed instructions on how to start a remote

control session from a PC or Mac in LogMeIn Pro); Ex. 29 ("Fundamentals" page for GoToMyPC, explaining basics of how to install and use the software); Ex. 30 (page with detailed installation instructions for GoToMyPC); Ex. 31 (page with detailed instructions on how to set up remote sessions in GoToMyPC); Ex. 32 (page with instructions on how to set up and sign in to LogMeIn Resolve); Ex. 33 (page with instructions on how to start a LogMeIn Resolve support session (remote control)); Ex. 34 (page with basic help information about installing and using LogMeIn Rescue); Ex. 35 ("Ten things to try" page with explanation of main functionality of LogMeIn Rescue); Ex. 36 (page with instructions on how a technician can use LogMeIn Rescue to control a customer's computer); Ex. 37 (page with instructions on how to setup and install LogMeIn Central); Ex. 38 (instructions on how to use LogMeIn Central to control a host computer).

100. GoTo also offers 24/7 phone support, a support site, forum/community support, and (for some products) dedicating onboarding/hands-on support services for the GoTo Remote Suite of products. *See, e.g.,* Ex. 39 (page indicating GoTo provides such support for GoToMyPC customers); Ex. 40 (page indicating GoTo provides "Premium Customer Support" for LogMeIn Central customers); Ex. 41 (page indicating GoTo provides "Whtie Glove Onboarding," "24/7/365 Phone Support," and "Dedicated Technical Amount Manager Team," a "Dedicated Support Number," and other support services for LogMeIn Rescue customers); Ex. 43 (page indicating GoTo provides "Support Center," "Community Support," and "Live Email/Chat/Phone Customer Support" services for LogMeIn Resolve customers). On information and belief, by such support resources and services, GoTo directs, instructs, and assists its end-customers in how to use the GoTo Remote Suite of products in their ordinary, and thus infringing, manner.

101. The acts of GoTo described in Paragraphs 99-100 *supra*—including publishing extensive instructions on how to use the GoTo Remote Suite in an infringing manner, and

providing active support to end-users in doing so—constitute acts by which GoTo actively induced, and continues to induce, its customers to infringe the method claims of the ‘502 Patent.

102. As discussed in Paragraphs 57-63 *supra*, on information and belief, when GoTo committed the inducing acts complained of above, it: (i) knew of, or was willfully blind to, the existence of the ‘502 patent; and (ii) knew of, or was willfully blind to, the fact that its end-users ordinary use of the GoTo Remote Suite infringed method claims of the ‘502 Patent.

103. Accordingly, for the foregoing reasons, GoTo is liable to Plaintiffs for induced infringement of method claims of the ‘502 patent under 35 U.S.C. § 271(b).

**COUNT VI – CONTRIBUTORY INFRINGEMENT OF THE ‘386 PATENT**

104. Plaintiffs repeat and reallege each of the allegations set forth in Paragraphs 1-103 *supra* as if fully set forth herein.

105. GoTo has unlawfully contributed to infringement of the ‘502 patent by selling the GoTo Remote Suite of products to customers in the United States, where the GoTo Remote Suite constitutes a material part of the claimed invention, where GoTo knew the GoTo Remote Suite was especially adapted for use in infringement of the ‘502 patent, and where the GoTo Remote Suite are not staple articles or commodities of commerce suitable for non-infringing use.

106. As shown in Paragraphs 92-94 *supra*, when the GoTo Remote Suite of products are used in their ordinary and intended fashion, such use constitutes direct infringement of the method claims of the ‘502 patent. Accordingly, when GoTo’s end-users use the GoTo Remote Suite in the United States, such use constitutes direct infringement of the method claims of the ‘502 Patent.

107. Because ordinary use of the GoTo Remote Suite directly infringes the method claims of the ‘502 Patent, the GoTo Remote Suite is a material or apparatus for use in practicing the patented process, constituting a material part of the invention.

108. As shown in Paragraphs 57-63 *supra*, on information and belief, when GoTo sold the GoTo Remote Suite in the United States, it knew, or was willfully blind, that ordinary use of the GoTo Remote Suite directly infringed method claims of the '502 patent. Thus, when it made such sales, GoTo knew (or was willfully blind) that the GoTo Remote Suite was especially made or especially adapted for use in an infringement of method claims of the '502 patent.

109. Finally, the GoTo Remote Suite products are not staple articles of commerce suitable for substantial non-infringing use. The infringing remote access functionality is the core feature of each of the GoTo Remote Suite products. Accordingly, none of the GoTo Remote Suite products are suitable for substantial non-infringing use.

110. Accordingly, for the foregoing reasons, GoTo is liable to Plaintiffs for contributory infringement of method claims of the '502 patent in violation of 35 U.S.C. § 271(c).

**REMEDIES, EXCEPTIONAL CASE, ENHANCED DAMAGES**

111. Plaintiffs repeat and reallege each allegation set forth in Paragraphs 1-110 *supra* as if fully set forth herein.

112. GoTo's direct infringement (Counts I, IV), induced infringement (Counts II, V) and contributory infringement (Counts III, VI) of the Patents-in-Suit have caused significant damage to Plaintiffs. As a result, Plaintiffs are entitled to an award of damages adequate to compensate them for the infringement, but in no event less than a reasonable royalty pursuant to 35 U.S.C. § 284. Plaintiffs are also entitled to recover prejudgment interest, post-judgment interest, and costs.

113. As shown in Paragraphs 57-63 *supra*, since at least August 2022, on information and belief, GoTo has known of the Patents-in-Suit, has known (or been willfully blind) that using the GoTo Remote Suite in the United States directly infringes method claims of the Patents-in-Suit, and has known (or been willfully blind) that selling the GoTo Remote Suite products to

customers in the United States induces and contributes to the infringement of method claims of the Patents-in-Suit. Despite having such knowledge (or willful blindness), Defendants have continued to use and sell the GoTo Remote Suite products in the United States continually from August 2022 to the present, and continue to sell these products today. GoTo's past, present and ongoing use and sale of the GoTo Remote Products in the United States constitutes past, present and ongoing direct and indirect infringement of method claims of the Patents-in-Suit.

114. Because GoTo has continually committed direct and indirect infringement over a period of at least four years, despite knowing (or being willfully blind) of its infringement throughout that period, GoTo's infringement has been willful. And, if GoTo continues to sell and use the GoTo Remote products in the United States after being served with this Complaint—which explains, in detail, how such conduct constitutes direct and indirect infringement of the method claims of the Patents-in-Suit—then its ongoing infringement will also be willful.

115. GoTo's infringing conduct has also been egregious. Despite knowing of (or being willfully blind to) its infringement for at least four years, GoTo committed infringement throughout that entire period, and continues to infringe today. GoTo is a large company with "more than 2,500 global employees, nearly $1 billion in annual revenue, and tens of millions of users." Ex. 11. Plaintiffs, meanwhile, are a small, family-owned company with limited resources. On information and belief, GoTo persisted in its willful infringement, at least in part, because it believed it could use its superior financial resources to overwhelm Plaintiffs in litigation. If proven, this would constitute "egregious" conduct, warranting an award of enhanced damages.

116. For at least the foregoing reasons, GoTo's conduct has been willful and egregious. Accordingly, under 35 U.S.C. § 284, the Court should enhance Plaintiffs' damages in this case by up to three times the amount found or assessed.

117. For at least the foregoing reasons, this case is an "exceptional" case within the meaning of 35 U.S.C. § 285. Accordingly, Plaintiffs are entitled to an award of attorneys' fees and costs, and the Court should award such fees and costs.

118. The Court should also enter a permanent injunction, permanently enjoining GoTo from infringing the Patents-in-Suit, because GoTo's ongoing infringement is causing irreparable harm to Plaintiffs.

## JURY DEMAND

119. Plaintiffs demand a jury trial on all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief as follows:

1. That judgment be entered in favor of Plaintiffs, and against GoTo;
2. That Plaintiffs be awarded damages adequate to compensate them for GoTo's infringement of the Patents-in-Suit, in an amount to be determined at trial, as well as pre-judgment and post-judgment interest thereon;
3. That Plaintiffs be awarded the costs of suit;
4. That GoTo's infringement be declared willful and egregious;
5. That the Court increase Plaintiffs' damages up to three times the amount assessed under 35 U.S.C. § 284;
6. That the Court declare this an exceptional case under 35 U.S.C. § 285, and award Plaintiffs their attorneys' fees and costs incurred in this action;
7. That the Court grant a permanent injunction preventing GoTo from continuing to infringe the Patents-in-Suit; and,
8. That the Court grant such further relief as it deems just and proper.

Dated: August 6, 2026

Respectfully submitted,

**Stamoulis & Weinblatt LLC**

*/s/ Stamatios Stamoulis*

Stamatios Stamoulis (#4606)
Richard C. Weinblatt (#5080)
800 N. West Street, Third Floor
Wilmington, Delaware 19801
Telephone: (302) 999-1540
Email: stamoulis@swdelaw.com
Email: weinblatt@swdelaw.com

**Glaser Weil Fink Howard Jordan & Shapiro LLP**

Lawrence Hadley*
Stephen Underwood*
10250 Constellation Boulevard, 19th Floor
Los Angeles, California 90067
Tel: (310) 553-3000
Fax: (310) 556-2920
Email: lhadley@glaserweil.com
Email: sunderwood@glaserweil.com
Email: jlinger@glaserweil.com

***Attorneys for Plaintiff***

* Admission *pro hac vice* anticipated